**Carl WILLNER, Appellee,**

v.

**Richard L. THORNBURGH, et al., Appellants.**

**No. 90–5156.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 11, 1990.

Decided March 29, 1991.

Henderson, Circuit Judge, filed dissenting opinion.

Stephen H. Sachs, Baltimore, Md., with whom Stephen M. Cutler and Gail C. Bernstein, Arthur B. Spitzer and Elizabeth Symonds, Washington, D.C., were on the brief, for appellee.

Robert V. Zener, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., and Jay B. Stephens, Washington, D.C., U.S. Atty., were on the brief, for appellants.

Before SILBERMAN, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

Dissenting opinion filed by Circuit Judge HENDERSON.

RANDOLPH, Circuit Judge:

This appeal adds to the list of constitutional challenges to federal drug-testing programs established pursuant to Executive Order No. 12,564, 51 Fed.Reg. 32,889 (1986). Since the Supreme Court's decision in *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), which involved a portion of the Customs Service's program, we have ruled on aspects of the drug-testing programs of the Executive Office of the President (*Hartness v. Bush*, 919 F.2d 170 (D.C.Cir.1990)); the Department of Agriculture (*National Treasury Employees Union v. Yeutter*, 918 F.2d 968 (D.C. Cir.1990)); the Department of Transportation (*American Federation of Government Employees v. Skinner*, 885 F.2d 884 (D.C.Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 1960, 109 L.Ed.2d 321 (1990)); the Department of the Army (*National Federation of Federal Employees v. Cheney*, 884 F.2d 603 (D.C.Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990)); and the Department of Justice (*Harmon v. Thornburgh*, 878 F.2d 484 (D.C.Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990)).

Each of our decisions rendered in the wake of *Von Raab* concerned federal employees who were, as a condition of employment, required to submit urine specimens for testing without any suspicion they were using drugs, and who were selected for testing on a random basis. This case differs from the rest in several respects, the significance of which is in dispute. The plaintiff here is an applicant for government employment. Rather than being selected at random, every applicant must undergo a urine test before being hired for the position he seeks.

Early in 1990, Carl Willner, an attorney, submitted a résumé to the Antitrust Division of the Department of Justice in Washington, D.C. After several interviews, he

received and accepted a conditional offer to join the Antitrust Division as a trial attorney. In connection with his employment application, Mr. Willner completed an extensive form setting forth detailed information about himself. The Federal Bureau of Investigation then conducted an investigation. On the form, Mr. Willner denied having used marijuana, cocaine, narcotics, hallucinogenics or other illegal drugs during the previous five years. He refused, however, to comply with the Department's request that he provide a urine sample.

The Department of Justice drug-testing plan requires all persons tentatively selected for employment in the Department's Offices, Boards and Divisions to provide a urine sample for testing. Applicants are notified at least forty-eight hours in advance of the time and place for the test. If they fail to show up or refuse to provide a urine sample, they are disqualified from further consideration for the job. If the chemical test of their sample is positive, they will not be offered the position and may not reapply for six months. The chemical analysis is designed to detect use of cocaine, marijuana, amphetamines, opiates and phencyclidine, and is the same as that described in *American Federation of Government Employees*, 885 F.2d at 887–88; *National Federation of Federal Employees*, 884 F.2d at 606; and *Harmon*, 878 F.2d at 486.

Before applying to the Antitrust Division, Mr. Willner knew of the Department's drug-testing program and of its requirement that all individuals tentatively selected for employment must undergo urinalysis. While in private practice, Mr. Willner represented the plaintiffs in *Harmon v. Thornburgh*, the first of our drug-testing decisions issued after *Von Raab*. *Harmon* sustained random testing of Department of Justice employees having top secret security clearances, but held that suspicionless urinalysis of other Justice Department personnel violated the Fourth Amendment unless those individuals were engaged in drug prosecutions. In view of *Harmon*, the Justice Department could not require urine tests of attorneys already holding the posi-

tion Mr. Willner sought, unless they were suspected of drug use.

The district court framed the question as: "whether, between a current Antitrust Division attorney and an applicant for such a position, there is a constitutional distinction that would render the testing of the latter permissible under the Fourth Amendment" (Memorandum of District Court, May 15, 1990, at 4) 738 F.Supp. 1. The court found no such distinction and concluded that the government's interests in requiring the test were the same as those *Harmon* rejected as insufficient. The court therefore permanently enjoined the Department of Justice from testing applicants for positions when employees occupying those positions could not be tested.

I

*Von Raab*, 109 S.Ct. at 1390, and its companion case, *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989), held that the government's collection and testing of urine samples from employees according to the procedures outlined in those decisions invaded "reasonable expectations of privacy" and were therefore Fourth Amendment "searches." Such searches, even if conducted without probable cause or suspicion of drug use, do not necessarily infringe upon the Fourth Amendment's "right of the people to be secure in their persons ... against unreasonable searches...." *Von Raab* ruled that "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is *impractical* to require a warrant or some level of individualized suspicion in the particular context." 109 S.Ct. at 1390 (emphasis added).

■ *Von Raab's* balancing test is inherently, and doubtless intentionally, imprecise. The Court did not purport to list all of the factors that should be weighed or to identify which factors should be considered more weighty than others. *See Harmon*,

878 F.2d at 488–89. Nonetheless, balance we must. The condition making it necessary to do so—that the "Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement" (*Von Raab*, 109 S.Ct. at 1390)—is satisfied in this case. *Railway Labor Executives*, 109 S.Ct. at 1414, on which *Von Raab* relied in formulating the standard just quoted, stated that the government's interest in the "operation of a government office"—here the Department of Justice—presents such "special needs." 109 S.Ct. at 1390. Furthermore, the Justice Department does not test applicants for law enforcement purposes; the test results are not distributed and cannot be used as evidence in a criminal trial. Exec.Order No. 12,564, 51 Fed.Reg. at 32,-892. *See also Von Raab*, 109 S.Ct. at 1390–91.

■ In our other decisions concerning random drug testing of incumbents, the balance we struck turned to a large extent on the nature of the employee's position. When the job involved drug enforcement or when the employee's drug use might endanger others, for example, we have recognized that the government's interests are sufficiently strong to allow random testing. *Harmon*, 878 F.2d at 490–91; *National Treasury Employees Union*, 918 F.2d at 972; *American Federation of Government Employees*, 885 F.2d at 891–92; *National Federation of Federal Employees*, 884 F.2d at 612, 613. The job Mr. Willner sought fell within neither category. But that is neither the beginning nor the end of our inquiry. The protections of the Fourth Amendment are graduated in proportion to the privacy interests affected. Decreasing levels of intrusiveness require decreasing levels of justification. If the reasonable privacy expectations of applicants are less than those of employees and if the testing procedure for applicants is itself unintrusive, the government is not required to demonstrate as high a degree of justification as it must to conduct random testing of those already employed.

II

We shall deal first with the extent of privacy interests applicants such as Mr. Willner possess with respect to urine testing. In other contexts, when "the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search" (*Camara v. Municipal Court*, 387 U.S. 523, 533, 87 S.Ct. 1727, 1733, 18 L.Ed.2d 930 (1967)), the Fourth Amendment does not require a warrant. *See Griffin v. Wisconsin*, 483 U.S. 868, 873–74, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987); *New Jersey v. T.L.O.*, 469 U.S. 325, 340, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985); *O'Connor v. Ortega*, 480 U.S. 709, 725–26, 107 S.Ct. 1492, 1501–02, 94 L.Ed.2d 714 (1987) (plurality opinion). When the "privacy interests implicated by the search are minimal," the Court has recognized, as it did in *Von Raab* and *Railway Labor Executives*, that a warrantless search may be reasonable even in the absence of suspicion of illegal conduct. *T.L.O.*, 469 U.S. at 342 n. 8, 105 S.Ct. at 743 n. 8.

■ As we read the Court's opinions in *Von Raab* and *Railway Labor Executives*, even a current employee's "expectation of privacy," while "reasonable" enough to make urine testing a Fourth Amendment "search," can be so "diminished" that the search is not "unreasonable." *See Von Raab*, 109 S.Ct. at 1390, 1394. This simply recognizes that Fourth Amendment "searches" vary in their intrusiveness. Taking a person's fingerprints, for example, and ransacking a person's dwelling place, while both "searches" (*see Hayes v. Florida*, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985); *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969)), may require different degrees of justification to make them "reasonable." The district court in this case was surely correct that "an applicant has some expectation of privacy; in applying for a job he does not thereby consent to, for example, a warrantless search of his home" (Memorandum of District Court, May 15, 1990, at 8). But urine testing, particularly in view of the procedures followed at the Justice De-

partment, is on a different end of the spectrum.

*Railway Labor Executives*, 109 S.Ct. at 1413, held that urine testing involves two searches, the first when the sample is collected and the second when it is analyzed. As to the first search—the collection process—Justice Department applicants are subjected to far less of an intrusion than were the employees in *Railway Labor Executives* and *Von Raab*. In those cases, a "monitor of the same sex as the employee remain[ed] close at hand to listen for the normal sounds of urination" or to observe directly as the employee produced the sample. *Von Raab*, 109 S.Ct. at 1388; *Railway Labor Executives*, 109 S.Ct. at 1413; *id.* at 1428 (Marshall, J., dissenting); *see Harmon*, 878 F.2d at 486. This procedure, which Justice Scalia found "offensive to personal dignity," *Von Raab*, 109 S.Ct. at 1398 (dissenting opinion), and which the Court relied upon in finding a Fourth Amendment search, *Railway Labor Executives*, 109 S.Ct. at 1413, is not part of the Justice Department's program for applicants. There is no purposeful invasion of privacy of the sort involved in *Von Raab* and *Railway Labor Executives*. A Justice Department applicant produces the sample, not in a stall or behind a partition, as in *Von Raab*, but in the privacy of a small room behind a closed door, unless there is reason to suspect tampering. The Program Coordinator of the Department's drug-testing program, in an undisputed affidavit, stated that the sounds of urination cannot be heard and that the Department "certainly does not expect or require the collection person to hover near the door listening for urination sounds. After the individual is escorted to the enclosure, the collection monitor returns to the waiting room to receive the specimen from the individual." For these reasons, the collection process at the Department of Justice simulates what is a common medical procedure, an accepted part of a typical physical examination required by athletic teams, colleges, the military, life insurance companies and private employers. *See Bratcher v. United States*, 149 F.2d 742, 745 (4th Cir.), *cert. denied*, 325 U.S. 885, 65 S.Ct.

1580, 89 L.Ed. 2000 (1945); *see also, McDonell v. Hunter*, 612 F.Supp. 1122, 1130 n. 6 (S.D.Iowa 1985), *modified*, 809 F.2d 1302 (8th Cir.1987).

■ As to the second search involved in urine testing, the chemical analysis, *Railway Labor Executives* indicates that this invades privacy because it may reveal "private medical facts about an employee" (109 S.Ct. at 1413). But applicants for employment at the Justice Department cannot reasonably expect to keep such information secret. The only medical facts revealed to the Justice Department are whether the applicant has recently used illegal drugs. By divulging, as Mr. Willner did, whether he uses, or has used within the past five years, marijuana, cocaine, narcotics, hallucinogenics, or other dangerous or illegal drugs, and by consenting to an F.B.I. investigation in which his friends, neighbors, relatives and past and present business associates may be asked if he uses drugs, an applicant relinquishes whatever privacy he might otherwise retain with respect to such information, even when the information is derived from chemical analysis.

■ We begin then with a comparatively slight disturbance of the applicant's privacy. The collection process is dignified and discreet and unlike that described in *Railway Labor Executives* and *Von Raab;* the later test reveals no information that can, under the circumstances, be considered private. Other considerations further diminish the privacy expectations of job applicants like Mr. Willner. They know they will have to undergo a drug test if they are tentatively selected for employment at the Justice Department. Pre-employment testing is not random. Unlike the incumbents in *Harmon*, all applicants must provide a urine sample before being hired. The procedure is scheduled ahead of time and the applicant is given advance notice of the date. All of this, *Von Raab* indicated, reduces "to a minimum" the unsettling effect of unexpected intrusions. *Von Raab*, 109 S.Ct. at 1394 n. 2; *see Harmon*, 878 F.2d at 489. We recognize, of course, that the government cannot defeat a person's "reasonable" expectation of privacy merely by

giving notice of the impending intrusion. See *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring); *United States v. Taborda*, 635 F.2d 131, 137 (2d Cir.1980); Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn.L.Rev. 349, 384 (1974). But the applicant's knowledge of what will be required, and when, affects the strength of his or her interest. We so held in *National Federation of Federal Employees v. Weinberger*, 818 F.2d 935, 943 (D.C.Cir.1987): "Advance notice of the employer's condition, however, may be taken into account as one of the factors relevant to the extent of the employees' legitimate expectations of privacy."

Similarly, it is significant that the individual has a large measure of control over whether he or she will be subject to urine testing. No one is compelled to seek a job at the Department of Justice. *See Wyman v. James*, 400 U.S. 309, 324, 91 S.Ct. 381, 389, 27 L.Ed.2d 408 (1971). If individuals view drug testing as an indignity to be avoided, they need only refrain from applying. This too is an important distinction between applicants and incumbents. The choice presented to current employees—undergo random drug testing or lose your job—is not comparable to that facing applicants. In Judge Friendly's words, "there is a human difference between losing what one has and not getting what one wants." Friendly, *Some Kind of Hearing*, 123 U.Pa.L.Rev. 1267, 1296 (1975). The plurality opinion in *Wygant v. Jackson Board of Education*, 476 U.S. 267, 282–83, 106 S.Ct. 1842, 1851, 90 L.Ed.2d 260 (1986), recognized as much: "Denial of a future employment opportunity is not as intrusive as loss of an existing job." *See Harmon*, 878 F.2d at 489 n. 6.

We are mindful of the fact that the Customs Department employees in *Von Raab* became subject to drug testing only because they chose to apply for promotions. To that extent, they also had control over whether they would be tested and they had advance knowledge of the testing. The Supreme Court considered these factors among others that served to diminish their expectation of privacy. 109 S.Ct. at 1394 n.

2. We follow the same analysis. Rather than considering a factor separately to determine if it alone would be decisive, we must aggregate the factors on each side in order to strike the balance required by *Von Raab*. *See Hartness*, 919 F.2d at 172.

For applicants, still other factors further weaken their privacy expectations with respect to urine testing. As we have mentioned, in order to be considered for a position as an attorney at the Department of Justice, an applicant is required to undergo a thorough and exhaustive background investigation. The applicant is required to complete Standard Form 86 (SF–86), the government "Questionnaire for Sensitive Positions." The information requested includes the address of each of the applicant's residences during the past fifteen years; every job the applicant has held for the last fifteen years; and all organizations, domestic and foreign, with the exception of labor unions and political and religious organizations, of which the applicant has been a member during the last fifteen years. The applicant must also disclose all foreign countries he has visited. He must list all his immediate relatives and the names and addresses of four persons who know him well. The applicant is required to disclose any arrests, criminal charges, or convictions; he must reveal whether he, his spouse, or a company controlled by him has ever declared bankruptcy, been declared bankrupt, been subject to a lien, or had a judgment rendered against them for a debt. The applicant is also asked whether he has ever had a nervous breakdown or medical treatment for a mental condition.

The applicant must also provide information about his involvement with alcohol and illegal drugs. Specifically, the applicant is asked: "Do you now use or supply, or within the last 5 years have you used or supplied, marijuana, cocaine, narcotics, hallucinogenics, or other dangerous or illegal drugs?" The instructions accompanying the form remind the applicant that "knowingly falsifying or concealing a material fact is a felony which may result in fines of up to $10,000, or 5 years imprisonment, or

both." The applicant must also sign a release authorizing,

> any duly accredited representative of the Federal Government, including those from the U.S. Office of Personnel Management, the Federal Bureau of Investigation, and the Department of Defense, to obtain any information relating to my activities from schools, residential management agents, employers, criminal justice agencies, financial or lending institutions, credit bureaus, consumer reporting agencies, retail business establishments, medical institutions, hospitals or other repositories of medical records, or individuals. This information may include, but is not limited to, my academic, residential, achievement, performance, attendance, personal history, disciplinary, criminal history record, arrest, conviction, medical, psychiatric/psychological, and financial and credit information.

SF–86 at 10.

In addition, applicants for positions at the Justice Department are required to sign a form authorizing the release of their federal income tax returns for the last five years. Joint Appendix (J.A.) 202. The applicant is also fingerprinted for the purposes of checking criminal records. When SF–86 and the tax waiver form have been submitted, the Federal Bureau of Investigation conducts a background investigation. As described by the Executive Officer of the Antitrust Division of the Justice Department,

> The background inquiry is thorough. At a minimum, the FBI will contact all references and close personal associates listed on the SF–86, as well as former spouses, employers and co-workers. The FBI will also conduct neighborhood checks on all residences, interviewing landlords and neighbors.... A regional credit bureau check is also conducted, covering all areas in which the applicant has lived. Military records and police records in all jurisdictions in which the applicant has resided are also examined.

Thus, as a general matter, applicants for Justice Department positions cannot reasonably expect to—and in fact do not—shield their private lives from government scrutiny during the hiring process. The background investigation is an extraordinarily intrusive process designed to uncover a vast array of information about those applying for jobs in the Department of Justice. As the Supreme Court stated in *Von Raab*, 109 S.Ct. at 1397, this "especially" "may be expected to diminish their expectations of privacy in respect of a urinalysis test." *See American Federation of Government Employees*, 885 F.2d at 893; *National Federation of Federal Employees*, 884 F.2d at 612–13.

Common practice, in the government and in the private sector, is also a measure of the degree of privacy job applicants reasonably can expect. *See O'Connor v. Ortega*, 480 U.S. 709, 732, 107 S.Ct. 1492, 1505, 94 L.Ed.2d 714 (1987) (Scalia, J., concurring); *Transportation Institute v. U.S. Coast Guard*, 727 F.Supp. 648, 655 (D.D.C.1989). Plagued with increased absenteeism, lower productivity, and workplace disruption connected with employee drug use, private companies have increasingly turned to drug testing as a means of dealing with the problem. A recent study by the Bureau of Labor Statistics found that drug-testing programs have become fairly common in the nation's largest firms. The study showed that the larger the work force, the more likely the employer would have a drug-testing program. Almost 60 percent of private employers with 5,000 or more employees had such programs and another 11 percent were considering implementing one. Bureau of Labor Statistics, U.S. Department of Labor, Survey of Employer Anti-drug Programs, Report 760, at 6, table 1 (Jan.1989) (J.A. 174).

Overall, "[d]rug-testing programs are aimed more towards job applicants than employees." *Id.* at 5 (J.A. 173). More than 85 percent of employers with drug-testing programs tested job applicants; of those that tested job applicants, 83 percent tested *all* applicants while only 16 percent limited testing to selected occupations. *Id.* at 8, table 4 (J.A. 176). Some of the nation's largest employers, including American Telephone & Telegraph, DuPont, Exxon, Federal Express, Trans World Airlines, and

United Airlines, have drug-testing programs for job applicants. *See* Adams, *Random Drug Testing of Government Employees: A Constitutional Procedure*, 54 U.CHI.L.REV. 1335, 1337 (1987). Such testing has become more common in recent years. Between 1982 and 1985 the number of FORTUNE 500 corporations having drug-testing programs more than doubled. Rothstein, *Drug Testing in the Workplace: The Challenge to Employment Relations and Employment Law*, 63 CHI.-KENT L.REV. 683, 703 (1987).

These statistics are of course quite general. They say nothing, for example, about the hiring processes of large private law firms. It is also true that private employers, unconstrained by the Fourth Amendment, may engage in practices the government as employer cannot. Nonetheless, what is occurring generally outside government is some indication of what expectations of privacy "society is prepared to accept as 'reasonable'" when the government engages in the hiring process. *Katz v. United States*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). *See California v. Greenwood*, 486 U.S. 35, 40–41 & nn. 3, 4, 108 S.Ct. 1625, 1628–29 & nn. 3, 4, 100 L.Ed.2d 30 (1988), which relied on private practices to determine what was a "reasonable" expectation of privacy.

### III

On the other side of the scale are the interests of the Justice Department. The purpose of weighing the government's interests against those of applicants is to determine whether it would be "impractical to require" that before testing a job applicant, the Justice Department obtain a warrant or suspect that the person is using drugs. *Von Raab*, 109 S.Ct. at 1390. Our focus is on the government in its role as an employer at the hiring stage. The Department of Justice, of course, is not just any employer. It has a legitimate interest in maintaining public confidence and trust. Drug use among its employees would undermine the Department's credibility as the nation's leading law enforcement agency. But it has other concerns. To the Justice

Department, like any other employer, an applicant is a stranger. The hiring process at the Department of Justice, particularly the interviews and background investigation, is designed to gather information so that a judgment may be made regarding the individual's suitability for employment. That too is the purpose of pre-employment drug testing. To require a warrant or individualized suspicion at the hiring stage would therefore all but defeat the purpose of testing applicants.

The Justice Department's interest with respect to applicants is thus not simply promoting a public image of integrity, which *Harmon* deemed insufficient by itself to overcome the interests of incumbents. 878 F.2d at 490. Any employer, including the Justice Department, makes a considerable investment in terms of time and money whenever it hires someone. The hiring process itself entails substantial costs. Those new to the job must be trained and ordinarily will require some period of time on the job before they reach full productivity. For economic reasons alone, the Department is therefore entitled to compile pertinent information about those who seek positions with it. That is the only sensible way to predict how an applicant would perform and it is why private employers, with increasing frequency, are drug testing applicants. If the practice became even more widespread, if the private sector almost invariably tested for drugs while the public sector did not, individuals with drug problems might tend to migrate toward government employment. Yet the government, no less than private employers, has a very substantial interest in preventing such individuals from entering its work force.

Recent empirical studies have shown that individuals who test positive in pre-employment drug tests have higher rates of absenteeism and involuntary separation. The United States Postal Service, in an ongoing study of the relationship between drug test results and job performance, has found that "[e]mployees who tested positive for drugs were found to have a 47% higher rate of involuntary separation than those who tested negative," and "the positive

group ha[d] a 59% higher absence rate than the negative group." U.S. Postal Service, An Empirical Evaluation of Preemployment Drug Testing in the United States Postal Service—Second Interim Report of Findings, at II (Sept.1989). Another, more limited study, "found that those with marijuana-positive urine samples have 55% more industrial accidents, 85% more injuries, and a 78% increase in absenteeism. For those with cocaine-positive urine samples, there was a 145% increase in absenteeism and an 85% increase in injuries." Zwerling, Ryan & Orav, *The Efficacy of Preemployment Drug Screening for Marijuana and Cocaine in Predicting Employment Outcome,* 264 J.A.M.A. 2639, 2643 (Nov. 28, 1990). These studies and others mentioned in the Postal Service report thus confirm what one would expect—an extremely high correlation between a positive result in a pre-employment drug test and subsequent employment problems. *See also,* R. DE-CRESCE, M. LIFSHITZ, A. MAZURA & J. TILSON, DRUG TESTING IN THE WORKPLACE (1989); M. DE BERNADO, DRUG ABUSE IN THE WORKPLACE: AN EMPLOYER'S GUIDE FOR PREVENTION (1987).

The government's interest in detecting drug use is substantial at the pre-employment stage because, as we have already mentioned, the applicant is an outsider. Background checks and information supplied by the applicant assist the government in making what can, at best, be only a prediction about the individual. The fact remains that the applicant is a person the government, as prospective employer, has had no opportunity to observe in the setting of the workplace. This too differentiates applicants from incumbents. In *Harmon* we noted that Justice Department "employees ... work in 'traditional office environments,' in which drug use is, presumably, more easily detected by means other than urine testing." 878 F.2d at 489. In regard to incumbents, therefore, direct observation together with the reasonable suspicion test may uncover those employees who ought to be tested. That obviously is not true for applicants and is another factor to be weighed in favor of finding it "impractical" for the Justice Department to

obtain warrants or information leading it to suspect drug use before requiring candidates for employment to be tested. *See Von Raab,* 109 S.Ct. at 1397 ("In assessing the reasonableness of requiring tests of these employees, the court should also consider ... the supervision to which these employees are already subject."). For these reasons, commentators otherwise opposed to drug testing of incumbents have concluded that the government, without violating the Fourth Amendment, may require job applicants to undergo urine testing. *See* 3 W. LAFAVE, SEARCH AND SEIZURE § 10.3, at 123–24 (Supp.1991); Note, *Employee Drug Testing—Balancing the Interests in the Workplace: A Reasonable Suspicion Standard,* 74 VA.L.REV. 969, 991–92 (1988); Miller, *Mandatory Urinalysis Testing and the Privacy Rights of Subject Employees: Toward a General Theory of Legality Under the Fourth Amendment,* 48 U.PITT.L.REV. 201, 236–37 (1986).

### IV

■ Our conclusion is that for job applicants like Mr. Willner their privacy expectations in regard to the Justice Department's urine testing requirement are significantly diminished and are far less than those of incumbents. Unlike current employees, job applicants are routinely required to reveal considerable amounts of information about themselves, information the employer uses to make responsible hiring decisions. The urine testing procedure at the Justice Department minimizes the intrusion and the chemical analysis later performed on the urine sample reveals no information the applicant has a cognizable interest in keeping secret. An applicant may avoid even this minimal invasion of privacy by not seeking employment with the Justice Department. On the other hand, the Justice Department's interests, as an employer, in requiring applicants to undergo urinalysis are strong. Drug testing in the context of a job application is commonplace. Although an employer may monitor an incumbent's performance, and thus be required to have individualized suspicion before subjecting the employee to

urinalysis, such a requirement for testing applicants would be "impractical." *Von Raab*, 109 S.Ct. at 1390.

For these reasons we hold that urine tests of applicants for positions as attorneys at the Justice Department do not constitute "unreasonable searches" under the Fourth Amendment. The district court's injunction is therefore vacated.

*So ordered.*

HENDERSON, Circuit Judge, dissenting:

In holding that the Department of Justice may require an applicant to submit to urinalysis as a precondition of employment in the Antitrust Division, the majority in my view impermissibly restricts the protection of the fourth amendment. Along the way, it gives inadequate weight to existing circuit authority, bases its opinion on a palpable logical inconsistency, improperly injects a new element into the fourth amendment equation and conducts its balancing test with a thumb firmly on the government's side of the scale.

It is well established in fourth amendment jurisprudence that, in order to compel an individual to submit to suspicionless drug testing, the government must establish that its interests in conducting the testing outweigh the individual's reasonable expectations of privacy. *See, e.g., Hartness v. Bush*, 919 F.2d 170, 172 (D.C. Cir.1990). The Supreme Court conducted this balancing test in two recent decisions, *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), and *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) and we have applied the principles from these decisions in several recent opinions, including *Harmon v. Thornburgh*, 878 F.2d 484 (D.C.Cir.1989), *cert. denied,* ‒‒ U.S. ‒‒, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990). These three decisions provide the tools necessary to conduct the balancing inquiry here. I believe the majority, however, misuses those tools.

I.

The first, and to my mind the paramount, flaw in the majority's opinion is its failure to consider an element that, until today, has been central to the fourth amendment evaluation of all similar government drug testing programs. Courts that have considered the constitutionality of drug testing programs have examined the connection between an individual's duties and the harm the government seeks to avert through the program. Only when the government has established a sufficient nexus between the two has the program been upheld.

In *Skinner*, for example, the Court focused on the "safety-sensitive tasks" that railroad employees perform, 109 S.Ct. at 1414, and found testing justified because the covered employees "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Id.* at 1419. Analogizing the railroad workers to those with "routine access to dangerous nuclear power facilities," the Court noted that they "can cause great human loss before any signs of impairment become noticeable to supervisors or others." *Id.*

Similarly, in *Von Raab*, the Court held that, in testing drug interdiction personnel, the government had a "compelling interest," 109 S.Ct. at 1393, that proceeded from at least two of the dangers that employee drug use created. First, the Court noted the "national interest in self protection could be irreparably damaged if those charged with safeguarding it were, because of their own drug use, unsympathetic to their mission of interdicting narcotics." *Id.* Second, the Court recognized the special dangers present when a government employee carries a firearm: "We agree with the Government that the public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force." *Id.*

In addition, this court has insisted that the nexus portion of the fourth amendment analysis be satisfied. In *Harmon*, we required a "clear, direct nexus ... between

the nature of the employee's duty and the nature of the feared violation" in order to uphold a mandatory urinalysis program aimed at protecting classified information. 878 F.2d at 490. Noting that, in *Von Raab*, the Supreme Court had found such a nexus to exist with respect to "truly sensitive information," 109 S.Ct. at 1396, we ruled that "the government may properly make testing a requirement for holding a top secret security clearance." 878 F.2d at 492.[1] Our decision in *Harmon* applied, however, only to the narrow class of Justice Department employees whose drug use, we held, could pose a sufficiently direct and immediate danger to warrant the intrusion of mandatory urinalysis. We emphasized that the requisite nexus does not exist for all Justice Department lawyers: "The government has ... required that all employees who prosecute criminal cases must undergo random testing. We do not believe, however, that under *Von Raab* an attorney who prosecutes *antitrust* or securities fraud cases can plausibly be analogized to a customs agent whose job is drug interdiction." 878 F.2d at 491 (emphasis added; original emphasis omitted); *see also id.* at 498 (Silberman, J., concurring) (noting the constitutional difficulties posed by testing of employees who are "never involved with drug-related crime" and concurring in court's "refusal to authorize drug testing of employees (like those in the *Antitrust* or Civil Rights Division) who are not responsible for drug-related criminal investigations and prosecutions") (emphasis added; original emphasis omitted).

In its opinion, the majority fails even to consider the relationship between the duties of a Justice Department antitrust lawyer and the threat that lawyer could pose if drug-impaired. The omission may proceed from a recognition that the nexus inquiry requires invalidation of the testing program in this case. That much is clear from our decision in *Harmon:*

> Certainly a blunder by a Justice Department lawyer may lead, through a chain of ensuing circumstances, to a threat to public safety. That sort of indirect risk, however, is wholly different from the risk posed by a worker who carries a gun or operates a train....
>
> ... *Von Raab* and *Skinner* focused on the immediacy of the threat. The point was that a single slip-up by a gun-carrying agent or a train engineer may have irremediable consequences; the employee himself will have no chance to recognize and rectify his mistake, nor will other government personnel have an opportunity to intervene before the harm occurs. *Von Raab* provides no basis for extending this principle to the *Justice Department, where the chain of causation between misconduct and injury is considerably more attenuated.*

878 F.2d at 491 (emphasis added; original emphasis omitted). Moreover, in *Harmon*, we explicitly declared that the requisite nexus does not exist with respect to Justice Department antitrust lawyers.

Nor can the majority's omission of the nexus requirement be justified by distinguishing Willner's status as an applicant from that of the incumbent employees in *Harmon* and *Skinner.*[2] The *Harmon* court characterized the threshold nexus requirement as demanding a close relationship between "the employee's duty and the nature of the feared violation." *Id.* at 490. The aim of the instant testing program is not to prevent some drug-related harm that Willner might cause *before* he secures employment at the Justice Department. It is only *after* he is hired that his potential drug use could threaten any harm the De-

---

**1.** We later followed the *Harmon* analysis in *Hartness v. Bush,* 919 F.2d at 173, where we upheld a program in the Executive Office of the President requiring testing of all employees with secret (as opposed to top secret) security clearances.

**2.** Although there may be differences between employees and applicants that are significant to the fourth amendment analysis, they affect privacy expectations and not the link required between an employee's duties and the dangers posed by his drug use. *See infra,* Part III; *see also Harmon,* 878 F.2d at 489 n. 6 (losing job is greater hardship than failing to obtain job; mandatory drug testing may therefore be more intrusive when result of individual's refusal to submit to testing is discharge rather than merely missing job opportunity).

partment as an employer has an interest in preventing. At that point, he is identical to the antitrust lawyers in *Harmon* who, according to this court, could not be constitutionally subjected to mandatory drug testing.

Taken to its logical end, the majority's reasoning sanctions a blanket testing requirement for all federal job applicants. In *Harmon*, however, we held that "federal employment alone is not a sufficient predicate for mandatory urinalysis." 878 F.2d at 490; *see also National Fed'n of Fed. Employees v. Cheney*, 884 F.2d 603, 613 (D.C.Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990). Accordingly, I would hold that simply applying for federal employment is too slim a reed to support mandatory drug testing.

## II.

My disagreement with the majority does not end with its failure to make the nexus inquiry. It identifies two governmental interests that favor the drug testing program: the "interest in maintaining public confidence and trust," maj. op. at 1192, and the high cost of hiring and training new employees. Maj. op. at 1192. The majority immediately acknowledges that this court has previously held the government's interest in "promoting a public image of integrity" to be "insufficient" to overcome employee privacy interests. Maj. op. at 1192–1193. Indeed, in *Harmon*, this court categorically announced that, even in conjunction with other asserted governmental interests, "the government's integrity interest cannot justify" a drug testing program covering all Justice Department lawyers who conduct grand jury proceedings or try criminal cases. *Harmon*, 878 F.2d at 490–91; *see also id.* at 498 (Silberman, J., con-

curring) (government's "powerful interest in preventing drug use" does not justify testing all Justice Department lawyers). This leaves "economic reasons," maj. op. at 1192, as the sole interest on the government's side of the scale.

I do not disagree with the majority that the government has a substantial interest in minimizing the expenses it incurs in the hiring and training of new Justice Department personnel. Nor do I dispute the majority's position that this interest permits the government to "compile pertinent information about those who seek positions" with the Justice Department in order to avoid the documented pernicious effects of employee drug use. Maj. op. at 1192. We do part company, however, where the majority concludes that the need to evaluate a potential employee's fitness justifies subjecting all applicants to the "needless indignity," *Von Raab*, 109 S.Ct. at 1400–01 (Scalia, J., dissenting), of urine testing.[3]

In concluding that mandatory urinalysis provides the government with the necessary means to investigate an applicant's fitness, the majority first considers in meticulous detail the sweep and effect of the FBI background investigation in relation to its impact on the applicant's privacy interests. Characterizing the investigation as "extraordinarily intrusive," maj. op. at 1191, and "thorough and exhaustive," maj. op. at 1190, the majority concludes that the background check, designed as it is to "uncover a vast array of information," maj. op. at 1191, about an applicant, significantly diminishes the reasonable privacy expectations of anyone applying to the Justice Department. But the majority at one time both runs with the foxes and hunts with the hounds. For when it turns to the government's interests supporting the test-

---

**3.** The fate of an applicant whose test is positive leaves open to some doubt the extent to which the Department's program effectively reduces its recruiting and training expenses. An applicant who has tested positive may reapply after six months and, if he then tests negative, may presumably be hired. Maj. op. at 1187. Thus, the Justice Department appears willing to employ individuals of whose drug use it has conclusive evidence if they can pass the drug test a second (or, theoretically, third or fourth) time. The

factor that qualifies an applicant for employment, then, appears to be not what past experience reveals about the likelihood that he will use illegal drugs but rather his ability to once test negative. This consideration makes the Department's program appear to be less a means to screen out applicants likely to use illegal drugs and more an "immolation of privacy and human dignity in symbolic opposition to drug use." *Von Raab*, 109 S.Ct. at 1398 (Scalia, J., dissenting).

ing program, the majority apparently concludes that the investigation it formerly found so complete now leaves the Justice Department with no insight whatsoever into an applicant's fitness. The Department may use drug testing in its hiring process, we are told, because an applicant is "an outsider," a "stranger," someone whom the government "has had no opportunity to observe in the setting of the workplace." Maj. op. at 1192, 1193.

Given this volte-face, one wonders which is the more accurate characterization of the FBI check: Is it "extraordinarily intrusive" and "thorough and exhaustive" or is it an inquiry that leaves its subject a "stranger?" From the majority's description, *see* maj. op. at 1190–1191, the investigation seems much more the former than the latter. If that is so, the crucial question then is whether the marginally greater information that drug testing reveals about an applicant justifies the substantially increased intrusion on the applicant's privacy. *Cf. Delaware v. Prouse*, 440 U.S. 648, 659–60, 99 S.Ct. 1391, 1399, 59 L.Ed.2d 660 (1979) (examining practice's "incremental contribution" to safety to determine whether it "qualif[ied] as a reasonable law enforcement practice under the Fourth Amendment"). I have no difficulty answering this question in the negative. It is true that the FBI check does not conclusively establish that the applicant uses no illegal drugs; but even urinalysis cannot always do this. *See Von Raab*, 109 S.Ct. at 1396. The investigation does, however, make available to the Justice Department significant information from which it can evaluate the applicant's fitness and likely drug use.

Chief among this information is what the FBI learns from an applicant's former employers and co-workers. During the application process, an applicant must disclose all jobs he has held for the past fifteen years and he must permit government officials to request of his former employers information relating to his "achievement, performance, attendance, personal history, [and] disciplinary ... history." Questionnaire for Sensitive Positions, Standard Form 86. The FBI also questions an applicant's present and former co-workers. Joint Appendix at 230. It ignores the nature of this inquiry to conclude, as the majority does, that the extensive information obtained provides no basis whatsoever to evaluate a prospective employee's likely drug use. The information the government receives from former employers and co-workers regarding the applicant's past professional conduct and work product is precisely the sort that will shed the most light on an applicant's tendency toward illegal drug use.

Furthermore, as a Justice Department antitrust lawyer, Willner will not be in a position analogous to those of the Customs Service field agents who the *Von Raab* Court held could be tested. There, the Court concluded that a mandatory urinalysis program complied with the fourth amendment in part because of the difficulty of monitoring an individual's fitness by subjecting his "work-product to the kind of day-to-day scrutiny that is the norm in more traditional office environments." 109 S.Ct. at 1395. Here, by contrast, Willner has accumulated and revealed to the government an extensive history of performance in traditional office environments.[4] By the time he sought employment with the Justice Department, Willner had completed law school, two year-long federal appellate clerkships and over four years' practice at a large law firm. He had worked in just the sort of "traditional office environments" that the *Von Raab* Court noted allow a performance evaluation that may render mandatory drug testing an unreasonable search under the fourth amendment. Indeed, this court has

4. Lawyers apply to the Department of Justice in two different ways. The first group of applicants is composed of individuals, like Willner, who have gained professional experience after law school. Joint Appendix at 208. The Department also hires new lawyers through its Honor Program, "a highly competitive program in which applicants are selected from among the most outstanding recent law school graduates and judicial law clerks." Declaration of Thomas King, Joint Appendix at 199. Willner falls into the first group of applicants—that composed of individuals who have gained professional experience.

recently stressed the significance of an office setting "in which drug use is, presumably, more easily detected by means other than urine testing." *Harmon,* 878 F.2d at 489. In light of the government's ability to gauge Willner's professional performance through its "exhaustive" background investigation and Willner's established work record, the majority seems to wink at reality when it concludes that the government's need for information weighs heavily in favor of mandatory pre-employment testing.

## III.

In analyzing the applicant's reasonable expectations of privacy, I believe the majority also errs in the weight and effect it gives two different factors. First is that, as an applicant with notice of the testing requirement, he triggers the process himself. This factor, while relevant, *see National Fed'n of Fed. Employees v. Weinberger,* 818 F.2d 935, 943 (D.C.Cir.1987), does not merit the weight the majority gives it in concluding that an applicant's reasonable expectations of privacy are "significantly diminished." Maj. op. at 1193. The same factor was present in *Von Raab,*[5] but the Court there attributed little, if any, significance to it, merely identifying it in a footnote, without elaboration, as affecting the employees' privacy expectations. *See Von Raab,* 109 S.Ct. at 1394 n. 2; *see also Harmon,* 878 F.2d at 489. As discussed above, the *Von Raab* decision turned on the efficacy of urinalysis in preventing particular harms, not on the privacy implications of advance warning of the

testing requirement. Accordingly, the majority's focus on the notice aspects of the challenged program inappropriately departs from the course of previous balancing tests in similar contexts.

More significantly, I fear that the majority's consideration of private industry drug-testing practices as part of its constitutional analysis is both improper and potentially dangerous. It is beyond question that mandatory urinalysis, both of applicants and incumbent employees, is common in private industry. Nevertheless, private employers' practices cannot, and until today have not, become the yardstick by which we measure the government's compliance with constitutional mandates. The government is unique in being subject to the dictates of the Constitution; private entities are bound by no such strictures. *See United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984) (fourth amendment "is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government") (internal quotation omitted); *see also Walter v. United States,* 447 U.S. 649, 656, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410 (1980); *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). It is therefore wholly inappropriate for the majority to import into a fourth amendment analysis consideration of private sector practice.[6]

The phenomenon of private industry's employee drug testing is not something

---

**5.** In *Von Raab,* only an employee who applied for transfer or promotion was subject to the testing program and the employee knew in advance of the urinalysis requirement. *Von Raab,* 109 S.Ct. at 1388. An individual who refused to submit to testing lost only the opportunity for a promotion; he did not risk losing a job. *National Treasury Employees Union v. Von Raab,* 816 F.2d 170, 173 (5th Cir.1987). He was therefore in a position identical to Willner's: by refusing to undergo testing, he did not lose anything he already had, but merely forewent an opportunity for advancement. *Cf. Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 282–83, 106 S.Ct. 1842, 1851, 90 L.Ed.2d 260 (1986) (plurality opinion) ("Denial of a future employment opportunity is not as intrusive as loss of an existing job"); maj. op. at 1190. The Court did not, however, treat this as a distinction that

diminished the individual's expectations of privacy.

**6.** While admittedly not conclusive, I find it significant that before today, the Supreme Court and other courts, including this one, have not considered the impact of private sector activity on an individual's reasonable expectations of privacy. This is true throughout the line of decisions leading up to *Skinner* and *Von Raab.* In *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), the Court applied the fourth amendment to a municipality's housing code inspection program. Nowhere did the Court consider the effect on a resident's privacy expectations of the fact that landlords might retain the right to enter and inspect their tenants' homes. In *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d

that has occurred so recently that this court is the first to have the opportunity to consider its fourth amendment implications. Similar conditions existed at the time *Von Raab* and *Skinner* were decided, as well as when we faced the issue in *Harmon*. *See* Bureau of Labor Statistics, U.S. Department of Labor, Survey of Employer Anti-drug Programs, Report 760, at 6 (Jan. 1989). In spite of the prevalence of mandatory urinalysis for private employees, however, neither this court nor the Supreme Court relied on the practice to justify such a government program. The reasons for this omission seemed obvious before today. The protections the Constitution provides against arbitrary government action will quickly evaporate if courts adopt, as the benchmark of fourth amendment reasonableness, the conduct of private entities.

### IV.

I find myself unable to join in the majority's opinion today. In conducting its bal-

ancing test, the majority dispenses with the requirement that the testing be reasonably calculated to avert some harm that a drug-impaired employee is likely to cause and it ignores the importance that its own opinion elsewhere attributes to the background check the FBI conducts on prospective employees. The majority attributes greater significance than ever before to the facts that an individual has notice of the testing requirement and that he triggers it himself by applying for employment. Most alarming, the majority inserts into the fourth amendment calculus the new element of private industry norms.

As the majority notes, the balancing test to be conducted under *Von Raab* is "imprecise," maj. op. at 1187, and "[r]ather than considering a factor separately to determine if it alone would be decisive, [the court] must aggregate the factors on each side in order to strike the balance." Maj. op. at 1190. The approach adopted by the majority, however, puts the scales in per-

720 (1985), the Court first held that the fourth amendment restricted the actions of a public school official in his search of a student's purse. *Id.* at 333–34, 105 S.Ct. at 738. It then balanced the "individual's legitimate expectations of privacy and personal security" against the "government's need for effective methods to deal with breaches of the public order." *Id.* at 337, 105 S.Ct. at 740. In its analysis, the Court did not consider whether private school officials, who are unfettered by the fourth amendment, subject their students to searches. In *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), the plurality opinion omitted any examination of private industry conditions in analyzing the privacy expectations of an individual challenging a government employer's search of his office. *See also Bluestein v. Skinner,* 908 F.2d 451, 456 (9th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991) (considering reasonableness of FAA-mandated urinalysis for airline employees, the court ignored impact on privacy expectations of airlines' privately implemented testing programs although such programs existed).

Neither of the decisions the majority relies on is to the contrary. In *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Court held that the government could not electronically eavesdrop on an individual's conversation from a public phone booth because it violated his reasonable expectations of privacy. In *California v. Greenwood,* 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), the Court held that an individual has no reasonable expecta-

tion of privacy in garbage left outside the curtilage of his property because "[w]hat a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection." *Id.* at 41, 108 S.Ct. at 1629 (quoting *Katz,* 389 U.S. at 351, 88 S.Ct. at 511). By deliberately placing their garbage where it was readily accessible to members of the public, the Court held, the *Greenwood* respondents had relinquished their expectations of privacy with respect to it. *Id.* at 40–41, 108 S.Ct. at 1628–29. By applying to the Justice Department, Willner has not relinquished his privacy expectations regarding the significantly more intrusive search here.

In order to come within the fourth amendment's protection, an individual's expectation of privacy must be "one that society is prepared to recognize as 'reasonable.' " *Katz v. United States,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). Contrary to the majority's reasoning, however, in order to be reasonable, this expectation of privacy does not have to be one that society recognizes between an individual and his private employer. Were there such a requirement, the court's task would be easy indeed since we would be constrained to permit the government to invade the privacy of its employees in the various ways available to a private employer. Until today, however, the fourth amendment has been construed to hold the government—even when acting as an employer—to a higher standard.

manent tilt. For this reason, I respectfully dissent.