**AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES (AFSCME) COUNCIL 79, Plaintiff,**

v.

**Rick SCOTT, in his official capacity as Governor of the State of Florida, Defendant.**

Case No. 11–civ–21976–UU.

United States District Court, S.D. Florida.

April 26, 2012.

Randall C. Marshall, American Civil Liberties Union Foundation of Florida, Shalini Goel Agarwal, ACLU Foundation of Florida, Inc., Peter G. Walsh, Stabinski & Funt, Miami, FL, for Plaintiff.

Jesse Michael Panuccio, Michael M. Sevi, Executive Office of the Governor, Tallahassee, FL, for Defendant.

### ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

URSULA UNGARO, District Judge.

THIS CAUSE is before the Court upon Plaintiff's Motion for Summary Judgment and Defendant's Motion for Summary Judgment. D.E. 33, 35.

THE COURT has considered the Motions, the pertinent portions of the record, and is otherwise fully advised on the premises.

### I. BACKGROUND

The instant motions address the constitutionality of Executive Order 11–58 ("EO"). Issued by Defendant, Governor

Rick Scott ("the Governor") on March 22, 2011, the EO directs all state agencies "within the purview of the Governor" to provide for mandatory drug testing for all "prospective new hires." The EO also requires that the covered agencies provide for random drug testing of all existing employees such that any employee at these agencies can be tested at least quarterly. By drug testing, the Governor means exclusively urinalysis.[1] Approximately 85,-000 individuals, comprising 77 percent of state government personnel, work at the covered agencies. The parties have not provided figures for the typical yearly number of new hires at the covered agencies. D.E. 19–1; D.E. 36 n. 2; D.E. 49 ¶ 16.

Plaintiff, the American Federation of State, Country, and Municipal Employees (AFSCME) Council 79, ("the Union"), which represents approximately 40,000 employees at the covered agencies, D.E. 34–22, contends that the EO violates the Fourth Amendment's prohibition of unreasonable searches. D.E. 33. The Governor makes three arguments for why the Union's Complaint should be dismissed as a matter of law. He argues that the Union lacks standing to challenge the EO. He claims that the EO does not violate the Fourth Amendment. Finally, he characterizes the Union's challenge to the EO as "facial," and contends that the Union cannot show that the EO is unconstitutional in all possible applications. D.E. 35.

The Court rules that the EO is inconsistent with controlling case law, and therefore grants the Union's motion for the reasons herein.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only when the moving party meets its burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. The Supreme Court explained in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), that when assessing whether the movant has met this burden, the court should view the evidence and all factual inferences in the light most favorable to the party opposing the motion.

The party opposing the motion may not simply rest upon mere allegations or deni-

---

1. Although the EO does not require a specific method of drug testing, the Governor indicates in his motion for summary judgment that urinalysis is the method that will be used to implement the testing program. D.E. 35 at 19. Additionally, the Governor asserts that the testing process will be private and confidential in compliance with existing provisions that regulate urinalyses performed under the Drug–Free Workplace Act ("the Act"), Fla. Stat. § 112.0455. The Act, first passed in 1990 and still in effect, permits state agencies to test job applicants, *id.* at 7(a), as well as current employees based upon "reasonable suspicion," *id.* at 7(b), as part of a routine fitness-for-duty medical examination, *id.* at 7(c), or as a follow-up to an employee's entrance into an assistance program for drug-related problems, *id.* at 7(d). The Act specifically prohibits the results of a drug test performed under its authority from being used as

evidence, obtained in discovery, or otherwise disclosed in any public or private proceeding. *Id.* at 11(a). Fla. Admin. Code 59A–24.005(3)(b) further provides that "individual privacy" must be afforded to the individual submitting to a drug test under the Act "unless there is reason to believe that a particular individual intends to alter or has altered or substituted the specimen to be provided." The Union does not challenge the Governor's assertion that urinalyses—as opposed to another form of drug-testing, such as blood or hair sampling—will be used to implement the EO. *See* D.E. 35 at 19 (Governor's assertion); D.E. 1 (Plaintiff's Complaint); D.E. 46 at 15–16 and D.E. 50 at 6–10 (pertinent sections of Plaintiff's response and reply briefs). The Union also does not challenge the Governor's claim that the urinalyses performed under the EO would be discrete, private, and confidential. *Id.*

als of the pleadings; after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the nonmoving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir.1997); *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989).

### III. QUESTIONS PRESENTED

Here, the parties present no genuine issue of material fact. The case turns instead on three questions of law raised by the parties in their respective motions for summary judgment (D.E. 33 and D.E. 35):(1) does the Union have standing to challenge the EO on its own behalf, on behalf of its members, and on behalf of prospective new hires?; (2) is the EO unconstitutional because it requires state agencies to conduct unreasonable searches?; and (3) does the Union bring a facial or an as-applied challenge and to what extent does this affect the relief that can be granted?

### IV. DISCUSSION

#### *Question (1)—Standing*

■ The Union brings the present action under 42 U.S.C. § 1983, asserting that the EO violates the Fourth Amendment's prohibition of "unreasonable searches and seizures." [2] The Eleventh Circuit recognizes two theories under which an associa-

tion has standing to sue under § 1983: "(1) to protect the rights of its members and (2) to protect its own rights as a corporate institution." *White's Place, Inc. v. Glover*, 222 F.3d 1327, 1328 (11th 2000) (quoting *Church of Scientology of Cal. v. Cazares*, 638 F.2d 1272, 1276 (5th Cir.1981)).[3] Accordingly, the Union must establish that it has standing to sue either on its own behalf or on behalf of its members. *Id.* at 1328–29. The Court addresses each of these possibilities in turn.

#### *(A) The Union's standing to sue on its own behalf*

■ To sue on its own behalf, the Union must establish that: (1) it suffers or will suffer an injury-in-fact that is concrete, particularized, and imminent ("injury"); (2) that the injury is fairly traceable to the Governor's challenged action ("traceability"); and (3) that the injury will likely be redressed by a favorable decision ("redressability"). *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

The Governor does not argue that the Union fails to meet the second and third requirements, and this Court, in any event, finds that these elements are satisfied. Instead, the Governor argues that the injury that the Union asserts-a search contrary to the Fourth Amendment-provides standing only to the individuals whose Fourth Amendment rights are infringed, and not to an association, such as the Union. D.E. 48 at 2–3. Thus, the outcome here turns on whether the Union has

---

**2.** The amendment provides in full: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to

be searched, and the persons or things to be seized." U.S. Const. amend. IV.

**3.** All decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

demonstrated that it has or will suffer an injury in fact.

▮▮▮ The Supreme Court has explained that injury-in-fact means "an invasion of a legally protected interest which is (a) concrete and particularized, ... and (b) actual and imminent, not 'conjectural' or 'hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In the situation of an association suing on its own behalf, the injury-in-fact requirement is satisfied where "the defendant's illegal acts impair [the association]'s ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir.2008) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982)); *see also Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350–51 (11th Cir.2009) (applying *Browning* to hold that plaintiff-association demonstrated injury where the alleged constitutional violation caused plaintiff-association "to divert resources from its regular activities" to address the alleged harm). The *Browning* court added that the extra expenses incurred to counteract the illegal act do not need to be calculated in advance of the litigation and can be small. 522 F.3d at 1165 ("The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury.") (quoting *Ind. Democratic Party v. Rokita*, 458 F.Supp.2d 775 (S.D.Ind.2006)), *aff'd sub nom., Crawford v. Marion County Election Bd.*, 472 F.3d 949 (7th Cir.2007), aff'd, 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008).

In this case, the Union's special counsel, Alma R. Gonzalez, testifies that the EO subjects more than 40,000 Union members to suspicionless drug testing. Gonzalez insists that if the EO is upheld, the Union will have to devote considerable resources "dealing with the implications of the policy." Specifically, Gonzalez claims that since drug testing is a mandatory subject of collective bargaining, the Union will have to engage in protracted negotiations over the policy, which, in turn, will detract from the Union's ability to bargain effectively over other issues. Gonzalez further testifies that the Union will have to expend considerable resources representing Union members selected for testing. Here again, the Union's concern, according to Gonzalez's testimony, is that representing members selected for testing will detract from its ability to represent employees in other matters. D.E. 34–22.

▮▮▮ The Court is persuaded that the Union has satisfied the injury in fact requirement as expressed above in *Browning* and *Common Cause/Georgia*. Under Florida law, public employees have the right to be represented by any employee organization of their own choosing and to engage in collective bargaining over the terms and conditions of their employment. Fla. Stat. § 447.301(2). The Governor responds that the Union has never initiated collective bargaining over drug testing even though, under existing state law, some Union members have been subjected to testing for years. D.E. 51 at 1. But the EO is also different than the existing testing regime. Currently, the Drug–Free Workplace Act, Fla. Stat. § 112.0455, authorizes pre-employment, reasonable suspicion, routine fitness-for-duty, and follow-up testing, but not random testing of all employees under the purview of the Governor as does the EO. *See supra* n. 1. The scope of the random testing provision in the EO is particularly significant for present purposes because the Florida Supreme Court has expressed the view that random testing of all public safety personnel— much less then the far broader swath of employees covered by the EO—triggers

collective bargaining unless the legislature provides otherwise. *Fraternal Order of Police, Miami Lodge 20 v. City of Miami,* 609 So.2d 31, 35 (Fla.1992).

Eleventh Circuit case law, moreover, supports the finding of injury for standing purposes where the association, as here, asserts that it will have to divert resources as a result of the challenged action. In *Browning,* the Court of Appeals cited the plaintiffs-associations' avowal that they would have to devote resources to helping voters comply with a contested voter registration law. 522 F.3d at 1164–65. Similarly, in *Common Cause/Georgia,* the Court of Appeals ruled that the plaintiff-association demonstrated a valid injury where it was undisputed that the association would have to "divert resources from its regular activities" as a direct result of the challenged statute. 554 F.3d at 1350.

The Governor attempts to defeat the Union's standing claim by pointing out that the "only 'harms' claimed by the Union itself are that it 'will have to spend considerable time in bargaining over the testing, and will have to expend considerable resources in representing state employees who are selected for testing.'" D.E. 48 at 3. Yet the claims that the Governor dismisses as immaterial for the purposes of demonstrating standing are the very types of assertions that the Court of Appeals in *Browning* and *Common Cause/Georgia* deemed relevant to satisfying the operative standard.

The Governor also argues that a separate rule bars standing here. Citing *Ra-kas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) and *Crosby v. Paulk,* 187 F.3d 1339 (11th Cir.1999), the Governor asserts that "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." D.E. 48 at 3.

■ But *Rakas* and *Crosby* do not address the availability of associational standing. Both are criminal cases in which defendants sought to suppress evidence taken in violation of another individual's Fourth Amendment rights. They stand for the proposition that Fourth Amendment rights are personal and cannot be asserted vicariously. As the Court put it in *Rakas:* "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." 439 U.S. at 134, 99 S.Ct. 421. (emphasis added). In other words, the defendants in *Rakas* and *Crosby* lacked standing because they suffered no injury at all.

In the present case, the Union is not seeking to assert its members interests vicariously. Instead, it is seeking to assert its own interests by identifying an injury that it will suffer as a consequence of having to devote its resources toward representing members affected by the EO. This claim, supported by the testimony of the Union's special counsel, suffices to show standing under *Browning* and *Common Cause/Georgia.*[4]

---

4. The Governor also refers to *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), where the Supreme Court held that the prudential standing rule typically bars a plaintiff who does not assert any personal right under the Constitution from asserting the rights or legal interests of others in order to obtain relief from injury to themselves. However, the Governor's reliance on *Warth* is unavailing. In *Warth,* the Supreme Court declined on prudential grounds—that is, not on the basis of the Article III standing requirements at issue here—to find that the association plaintiffs had standing to challenge the alleged discriminatory zoning practices created under a local zoning ordinance. Relevant to the present case, the *Warth* Court further indicated: "There is no question that an association may have standing in its own right to seek judicial relief from injury to itself

### (B) Union's standing to sue on behalf of its members

The Court also finds that the Union has standing by means of the alternative route for associational standing—the right to sue on behalf of its members.

In *Hunt v. Wash. State Apple Adver. Comm'n,* the Supreme Court held that an association has standing to bring suit on behalf of its own members when:

(a) its members would have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the law suit.

432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

Here, the Union's members would have standing to sue in their own right. The alleged injury in this case is a violation of the constitutional protection against unreasonable searches and, as discussed, satisfies the injury-in-fact elements, is traceable to the EO, and can be redressed by the relief requested. The second element is satisfied by Fla. Stat. § 447.301(2) (authorizing collective bargaining on the terms and conditions of public employment) together with the holding in *Fraternal Order,* 609 So.2d at 35, that the drug testing of all public safety employees triggers mandatory collective bargaining. As to the third element, an individual plaintiff need not maintain the action where, as here, a plaintiff-association seeks an injunction, which, if granted, "can reasonably be supposed ... [to] inure to the benefit of those members of the associations actually injured." *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434.

The Governor contends, however, that the Union must provide "detail about the context in which individual AFSCME members face actual or imminent injury-in-fact." D.E. 35 at 4. But the Court is hard-pressed to find any ambiguity in the "context" of the alleged harm. The EO subjects all state employees under the purview of the Governor—including approximately 40,000 members of the Union—to suspicionless drug testing, a practice which, without reaching the merits here, has been deemed by the Supreme Court to be subject to the limitations of the Fourth Amendment. *See, e.g., Chandler v. Miller,* 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997). As such, the Union has standing to sue on behalf of its members.

### (C) Union's standing as to new hires

Finally, the Governor claims that the Union lacks standing to challenge the portions of the EO that require pre-employment testing of prospective new hires because these prospective new hires are not union members. Under Eleventh Circuit case law, unions lack standing to assert the rights of non-members. *United States v. City of Miami,* 115 F.3d 870, 872 (11th Cir.1997) ("Local 587 lacks standing to assert rights of potential new hires because they are not union members.") Insofar as an applicant to a covered position is not, at the time of the pre-employment testing, a member of the Union, the Court agrees that, under *City of Miami,* the Union lacks standing to sue on behalf on these individuals. *Id.*

However, the Union claims that it has standing to represent current members, who, the Union asserts, are also affected by the pre-employment testing provision. Where a current member applies

and to vindicate whatever rights and immunities the association itself may enjoy." 422

U.S. at 511, 95 S.Ct. 2197.

for a promotion or transfer, the Union contends, the member will be treated as a new hire and thus required to undergo mandatory pre-employment testing. D.E. 46 at 1; D.E. 34–22 ¶ 5. The issue here is whether the pre-employment testing presents a real and immediate threat to the Union. In *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), the Supreme Court held that a plaintiff in a pre-enforcement challenge to official conduct, as here, must show that he or she "has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Id.* at 101–02, 103 S.Ct. 1660 (citations omitted).

Although the EO does not state explicitly that the term "new hire" includes current employees who are hired to fill another position at a covered agency, the Court is persuaded the EO provides as much. The Court looks to the Governor's construction of this term, as he issued the EO and the covered agencies charged to implement it have not yet had the opportunity to apply the policy. *See Gay v. Canada Dry Bottling Co.*, 59 So.2d 788, 790 (Fla. 1952) ("the contemporaneous administrative construction of the enactment by those charged with its enforcement and interpretation is entitled to great weight . . . ."); *see also, State ex rel. Szabo Food Services, Inc. v. Dickinson*, 286 So.2d 529, 531 (Fla. 1973) (holding that regulations from state agency charged with implementing state revenue statute "should be accorded considerable persuasive force before any court called upon to interpret the statute."). The plain language of the EO indicates that the Governor's intent is to require pre-employment testing of "all prospective new hires," as the EO specifically dictates. D.E. 1–3 § 1. By thus emphasizing that every new hire will be tested, the EO clearly implies that current employees who

apply for promotions or transfers are not exempt from mandatory pre-employment testing. This interpretation is also consistent Florida's Administrative Code insofar as it assigns the same probationary status to newly hired, newly promoted, and newly transferred employees, thereby suggesting that a current employee who transfers or receives a promotion will be treated the same as a new hire under the EO. *See* Fla. Admin. Code 60L–33.003(d)(1).

The facts in the record further indicate that the pre-employment testing provision in the EO poses an imminent harm to the Union. First, the Court notes that the Governor never corrected the Union's assertion that the EO's provision for "new hires" covers *current* employees seeking a promotion or transfer. *See* D.E. 48 at 3–4 and D.E. 51 at 1 (neither contesting Union's construction of "new hire"). Second, the pre-employment provision is a critical part of the EO. It comprises one of the order's two sections. (The other provides for random drug testing). *See* D.E. 1–3. Ms. Gonzalez, the Union's special counsel, specifically addresses the preemployment provision in her affidavit: "Thousands of AFSCME represented state employee bargaining unit members are now subject to random drug testing in their current positions, and pre-employment drug testing when they seek promotion to another job (and are considered new hires) . . . ." D.E. 34–22 ¶ 5. Ms. Gonzalez further testifies that the Union will have to expend time and resources dealing with the "implications of the policy." *Id.* ¶ 8. Additionally, the special counsel indicates that the Union will have to devote resources to answering member questions about the EO, engaging in collective bargaining over the testing, including "the conditions under which such testing takes place," and representing "bargaining unit employees who are selected for testing." *Id.* ¶ 8–10.

The existence of several realistic harms, both in the present and immediate future, makes the present case readily distinguishable from *Lyons*. In that case, the Supreme Court held that the plaintiff, who had been choked by the Los Angeles police, lacked standing to enjoin the police department from continuing to authorize the use of chokeholds because the plaintiff had not shown any "real or immediate threat" that he would suffer injury from being choked again by the Los Angeles police. *Lyons*, 461 U.S. at 111, 103 S.Ct. 1660. As such, Lyons's request for an injunction against the city's conduct was based on a "hypothetical state of facts," *see id.* at 129, 103 S.Ct. 1660, which will always fail to satisfy the "case or controversy" requirement of Article III of the U.S. Constitution.

By contrast, the injurious effects of the pre-employment provision on the Union are immediate and real. Covered agencies have sixty days from the issuance of the EO to begin pre-employment testing. The EO leaves no room for discretion or chance. It provides supervisors no flexibility in enforcing the policy: All new hires must take the drug test—no exceptions. D.E. 1–3. As Ms. Gonzalez testifies, the consequence of the pre-employment provision is to compel the Union to devote resources in the present and the near future in response to its members' concerns with the EO, including the apparent requirement that members take a drug test upon becoming "prospective new hires." Unlike the plaintiff in *Lyons*, the Union is paying the price of the EO now, and has sufficiently shown that the preemployment provision will continue to cause real harm by requiring the Union to divert resources to address it. *See* in *supra* section IV(A), *Browning*, 522 F.3d at 1165, and *Common/Cause*, 554 F.3d at 1350–51 (holding, in both, that forcing an organization to divert resources to counteract official con-duct constitutes a valid injury for standing purposes).

Accordingly, the Union has standing to challenge the pre-employment portion of the EO.

### Question (2)—The lawfulness of the EO

The issue is not whether the Governor can fire or take disciplinary action against a state employee for unlawful drug use. The EO does not address the consequences of unlawful drug use. Its concern is drug testing. The issue is whether the drug testing program mandated by the EO can be squared with the Fourth Amendment.

The Supreme Court maintains that the government, unlike private employers, can test its employees for illegal drug use only when the testing is consistent with the Fourth Amendment. "Because it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable ... these intrusions must be deemed searches under the Fourth Amendment." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing. *Chandler*, 520 U.S. at 313, 117 S.Ct. 1295. To warrant an exception from the main rule, the government must show that it has a "special need, beyond the normal need for law enforcement." *Id.* When, as here, the government alleges such a need, "courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Id.* at 314, 117 S.Ct. 1295. The permissibility of a drug-testing program "is judged by balancing its intrusion on the individual's Fourth

Amendment interests against its promotion of legitimate governmental interests." *Skinner,* 489 U.S. at 619–620, 109 S.Ct. 1402 (quoting *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)).

### (A) Assessing a public interest

In assessing the weight of the public interest rationale articulated by the Governor, this Court is guided by the analyses undertaken by the Supreme Court in the handful of cases in which it has considered the constitutionality of drug testing. The Court upheld testing programs against claims that they impermissibly intruded upon an individual's Fourth Amendment interests in three of these cases, *Skinner, Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), and *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), while striking down a program in *Chandler.* In the present case, the Court considers whether the Governor asserts a sufficiently compelling public interest, as was the case in *Skinner, Nat'l Treasury,* and *Vernonia,* or whether the asserted public interest here fails to justify the program as in Chandler.[5]

In *Skinner,* the Supreme Court considered whether the Federal Railroad Administration could require railroad operating personnel at private railroads to be tested for illegal drug or alcohol use following train accidents. "Employees subject to the tests," the Court observed, "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous conse-

quences." 489 U.S. at 628, 109 S.Ct. 1402. The Court likened the covered employees to personnel at nuclear power plants in that the potential for "great human loss" was present if they worked under the influence of drugs or alcohol. *Id.* Moreover, the Court indicated that evidence demonstrating that alcohol and drug use by railroad employees had caused or contributed to numerous significant train accidents had prompted the government's adoption of the testing regime. *Id.* at 607, 109 S.Ct. 1402. Citing the "surpassing safety interests" behind the policy, *id.* at 634, 109 S.Ct. 1402, the Court upheld the testing program.

Similarly, in *Nat'l Treasury,* the Court recognized the special need behind a testing program that covered U.S. Custom Service officials who applied for promotion to positions directly involving the interdiction of illegal drugs or requiring the incumbent to carry a firearm. 489 U.S. at 670, 109 S.Ct. 1384. "It is readily apparent," the Court remarked, "that the Government has a compelling interest in ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment." *Id.*

Unlike in *Skinner,* however, the Court in *Nat'l Treasury* did not refer to a concrete showing of past drug or alcohol use by the covered officials. The relevant data in *Nat'l Treasury* told the opposite story. The head of the Service testified that Customs was "largely drug-free." But this did not dissuade the Court, which held that where "the possible harm against which the Government seeks to guard is substantial, the need to prevent its occurrence

---

5. The Court has also considered *Bd. of Educ. v. Earls, infra,* 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002). But in light of the Supreme Court's statement in that case that it was "[a]pplying the principles of *Vernonia* to the somewhat different facts" in question, *Earls,* 536 U.S. at 830, 122 S.Ct. 2559, this

Court has chosen to rely primarily on *Vernonia,* which established the principle, applied in *Earls,* that "Fourth Amendment rights ... are different in public schools than elsewhere." *Id.* (quoting *Vernonia,* 515 U.S. at 656, 115 S.Ct. 2386).

furnishes an ample justification for reasonable searches to advance the Government's goal."[6]   *Id.* at 660, 674–675, 109 S.Ct. 1384.

In *Vernonia,* the Court upheld a mandatory drug testing program for public school students primarily because of the special responsibility that the state has toward public school children. Although the Court had the benefit of extensive evidence of a genuine drug problem among the covered student athletes, it emphasized that the "most significant" reason for affirming the testing program was that it was "undertaken in furtherance of the government's responsibility, under a public school system, as guardian and tutor of children entrusted to its care." 515 U.S. at 665, 115 S.Ct. 2386. Subsequently, in *Bd. of Educ. v. Earls,* which upheld a public school district's policy requiring students who participated in any of the district's competitive extracurricular activities to submit to urinalysis drug testing, the Supreme Court reiterated that " 'special needs' inhere in the public school context" and that "Fourth Amendment rights … are different in public schools than elsewhere." 536 U.S. 822, 829–30, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002).

Finally, in *Chandler* the Court struck down a Georgia statute that required candidates seeking election or nomination to various offices, including Governor, Lieutenant Governor, Secretary of State, Attorney General, Justices of the state Supreme Court, members of the General Assembly, and various commissioners, to verify that they had tested negatively for illegal drug use. Before addressing the

statute, the *Chandler* Court reiterated its rationale for finding that the government interests asserted in *Skinner, Nat'l Treasury,* and *Vernonia* were sufficiently compelling to justify the testing program in each case. "Surpassing safety interests," the Court noted, warranted the testing regulations in *Skinner.* 520 U.S. at 315, 117 S.Ct. 1295. The program in *Nat'l Treasury* was legitimate given that it was "developed for an agency with an 'almost unique mission,' as the 'first line of defense' against the smuggling of illicit drugs into the United States." *Id.* at 315–316, 117 S.Ct. 1295. In *Vernonia,* the Court noted, "[t]he program's context was critical," referring here both to the fact that the program covered school children for whom the state had a special responsibility, and that the student athletes subjected to the tests had been identified as "leaders of the drug culture." *Id.* at 316–17, 117 S.Ct. 1295. "Our precedents establish," the *Chandler* Court summarized, "that the proffered special need for drug testing must be substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Id.* at 318, 117 S.Ct. 1295.

Moving to the Georgia statute in question, the Court held that merely aspirational goals, such as promoting public confidence and trust in elected officials and demonstrating the government's commitment to the struggle against drug abuse, which are not tied to any real, concrete

---

**6.** The dissenting opinion rebuked the majority for not requiring the government to produce concrete evidence of past drug use leading to an actual harm. "What is absent in the Government's justifications—notably absent, revealingly absent, and as far as I am concerned dispositively absent—is the recitation of even a single instance in which any of the

speculated horribles actually occurred: an instance, that is, in which the cause of bribetaking, or of poor aim, or of unsympathetic law enforcement, or of compromise of classified information, was drug use." *Nat'l Treasury,* 489 U.S. at 683, 109 S.Ct. 1384 (Scalia, J., dissenting).

danger, do not constitute a "special need" sufficient to exempt a state from its normal Fourth Amendment requirements. According to the Court, Georgia had failed to present any evidence of a "concrete danger" that would demonstrate that the hazards the state sought to avoid were "real and not simply hypothetical." *Id.* at 319–20, 117 S.Ct. 1295. In particular, the state had asserted "no evidence of a drug problem among the State's elected officials," nor did the covered individuals "typically ... perform high-risk, safety-sensitive tasks." *Id.* "Symbolic" public concerns, the *Chandler* Court concluded, warrant no special departure from the Fourth Amendment. *Id.* at 322, 117 S.Ct. 1295.

*(B) The EO's asserted public interest*

In support of the EO, the Governor cites numerous public benefits that the testing policy is intended to achieve, including ensuring that the public workforce is fit for duty, increasing health and safety at the public workplace, promoting greater productivity among state employees, saving taxpayer money, reducing theft at the public workplace, and decreasing the risk to public safety that drug-impaired employees pose. D.E. 1–3. To demonstrate how the EO will achieve these goals, the Governor has filed numerous studies, surveys, reports, articles, handbooks, and statistics–105 exhibits accompany the Governor's

summary judgment motion alone-which show the prevalence of drug use in the workplace and the ill effects that drug use causes.[6] *Cf.* exhibits cited in D.E. 36 ¶¶ 7–12; D.E. 49 ¶ 24.

Most, if not all of the Governor's supporting exhibits lack probative value because they operate at such a high level of generality. The Governor presents various national studies that address the extent of drug use in the general population, and the effects that it has on the productivity, health, and safety of the national workforce. The studies do not describe the risks associated with drug users performing the specific jobs held by the Florida state employees covered by the EO.[7]

Nor do any of the reports document, much less evaluate, the extent of illegal drug use at the covered agencies. Here, the Governor presents drug-use data from the Departments of Corrections (DOC), Juvenile Justice (DJJ), and Transportation (DOT), each of which has conducted suspicion-less testing of a limited range of employees under the Drug–Free Workplace Act, Fla. Stat. § 112.0455. Together, the three departments comprise approximately forty-five percent of the employees subject to the EO. D.E. 33 at 2–3.

The random tests of employees at DOT and DJJ yielded positive results in less than one percent of cases between 2008 and 2011. D.E. 40–11; D.E. 40–14. At

---

**6.** The exhibits are also offered to show that drug testing has become a common and accepted practice in the private sector. *See particularly* exhibits cited in D.E. 36 ¶ 12. In this regard, the exhibits serve to support the Governor's contention that state employees have diminished privacy interests that are outweighed by the public interest in drug testing. The Court addresses this issue, and the exhibits to the extent relevant to this issue, *infra.*

**7.** *See, e.g.,* "Results from the 2010 National Survey on Drug Use and Health: Summary of National Findings," D.E. 36–6, "Workplace

Substance Use: Quick Facts to Inform Managers," D.E. 36–7, and "General Workplace Impact." D.E. 36–8, and "What You Need to Know about the Cost of Substance Abuse." D.E. 37–9. *See also* concerning Florida as a whole but not the covered agencies, "Florida Drug Control Update," D.E. 36–12, "State Estimates of Substance Use from the 2007–2008 National Surveys on Drug Use and Health," D.E. 36–13, "Drugs Identified in Deceased Persons by Florida Medical Examiners (2010)," D.E. 37–1, "Pill Mill Initiative," D.E. 37–2, and "Statewide Grand Jury Report." D.E. 37–3.

DOC, the random tests produced positive results in less than one percent of cases in 2008 and 2009, then increased to 2.4 and 2.5 percent in 2010 and 2011, respectively. D.E. 40–4. In all three agencies, the number of positive results from pre-employment tests has been less than one percent between 2008 and 2011. D.E. 40–4; D.E. 40–11; D.E. 40–14. By contrast, in *Skinner*, which the Supreme Court later cited in support of the holding that evidence of drug use could "shore up" an assertion of special need for suspicionless drug testing, *Chandler*, 520 U.S. at 319, 117 S.Ct. 1295, the Court noted that the government's testing program was supported by studies showing that 23 percent of operating personnel were "problem drinkers, and that from 1972 to 1983 there had been at least 21 significant train accidents where alcohol or drug use was a probable cause or contributing factor, resulting in 25 fatalities, 61 non-fatal injuries, and property damage of approximately $ 27 million in 1982 dollars." 489 U.S. at 607, 109 S.Ct. 1402. *See also Vernonia*, 515 U.S. at 649, 115 S.Ct. 2386 (1995) (emphasizing that the student athletes implicated in the testing program were not simply included among the drug users, but the leaders of the local drug culture).

The evidence that the Governor submits demonstrates, at length, that there is a public interest in a drug-free workforce, which is manifestly more productive and less of a health and safety risk than the drug-impaired alternative. But this interest is notably broad and general compared to the interests that the Supreme Court has held justify suspicionless drug testing. In *Skinner*, the Supreme Court found a compelling interest in testing railroad personnel where the government produced evidence that drug or alcohol abuse by the covered employees had led to and would continue to lead to "great human loss" unless a suspicionless testing regime was established. 489 U.S. at 628, 109 S.Ct.

1402. Similarly, in *Nat'l Treasury*, the Court found that the government's compelling interest in national self-protection was readily apparent where the testing directive applied to front-line U.S. Customs Service agents, who interdict drugs or carry firearms in the line of duty. 489 U.S. at 670, 109 S.Ct. 1384. And in *Vernonia*, the Court emphasized that in addition to the fact that the government had demonstrated an immediate drug-abuse problem among student athletes, the government's role in educating and guiding students heightened the government's interest in drug-testing. 515 U.S. at 660, 115 S.Ct. 2386.

All of the upheld drug-testing policies were tailored to address a specific, serious problem. In contrast, the rationale for the Governor's policy consists of broad prognostications concerning taxpayer savings, improved public service, and reductions in health and safety risks that result from a drug-free workplace. D.E. 1–3. The Governor's explanation of the EO's concern with public safety offers a particularly telling example of the speculative nature of the public interest behind the testing policy. His brief explains:

> Even a desk-bound clerk may become violent with other employees or the public, may present a danger when driving in a car in the workplace parking lot, or may exercise impaired judgment when encountering any of the myriad hazards that exist in the workplace environment (from stacks of heavy boxes, to high staircases, to files in high shelves, to wet floors, to elevators and escalators.)

D.E. 35 at 14. In other words, the Governor's safety rationale for the EO essentially relies on the Governor's common sense belief that because illegal drug use exists in the general population, it must also exist among state employees. And, the Governor predicts these drug-impaired employees will be less reliable and more accident-

prone; thus, a public benefit will be attained by ensuring that all state employees under the Governor's purview are drug-free. The Governor may be right, but unlike the programs in *Skinner, Nat'l Treasury,* and *Vernonia,* which were moored to concrete dangers, the Governor's program is detached from any readily-apparent or demonstrated risk. Rather, the Governor's broadly-defined objectives more closely resemble the state of Georgia's argument, rejected in *Chandler,* that the testing of state officials was justified because "the use of illegal drugs draws into question an official's judgment and integrity; jeopardizes the discharge of public functions, including anti-drug law enforcement efforts; and undermines public confidence and trust in elected officials." 520 U.S. at 318, 117 S.Ct. 1295. And in Chandler, the Supreme Court held that without evidence of a drug problem among the state's elected officials (who typically do not perform high-risk, safety-sensitive tasks), this justification was "symbolic, not 'special,'" as required by the relevant precedents. *Id.* at 322, 117 S.Ct. 1295.

This Court is mindful that when evaluating the public interest in the context of drug testing, it is erroneous to think that there is a "fixed, minimum quantum of governmental concern, so that one can dispose of a case by answering in isolation the question: Is there a compelling state interest here?" *Vernonia,* 515 U.S. at 661, 115 S.Ct. 2386. Rather, the appropriate consideration is whether the concern "appears important enough to justify the particular search at hand, in light of other factors that show the search to be relatively intrusive upon a genuine expectation of privacy." *Id.*

But this does not change the scope of the EO or the nature of the public interest

behind it—the general health, safety, economic, and public benefits that the Governor predicts would accrue from subjecting more than three-forth's of the state's public workforce to random and pre-employment drug testing. And it is this general and essentially speculative interest that the Court must weigh against the individual privacy interests of those subject to the EO.

### (C) Assessing privacy interests

The Supreme Court has held that drug testing by the government "intrudes upon expectations of privacy that society has long recognized as reasonable." *Skinner,* 489 U.S. at 617, 109 S.Ct. 1402. However, the Supreme Court has explained that an individual's expectation of privacy varies "with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park." *Vernonia,* 515 U.S. at 654, 115 S.Ct. 2386 (internal citations omitted). In drug-testing cases, courts have held that extensive government regulation of an individual's profession, *Skinner,* 489 U.S. at 627, 109 S.Ct. 1402, direct involvement in drug interdiction or the carrying of a firearm in the line of duty, *Nat'l Treasury,* 489 U.S. at 672, 109 S.Ct. 1384, invasive background checks, *Willner v. Thornburgh,* 928 F.2d 1185, 1188 (D.C.Cir.1991), and medical examinations, *Nat'l Treasury,* 489 U.S. at 677, 109 S.Ct. 1384, diminish an individual's reasonable expectation that he or she will not be subject to suspicionless drug-testing.

### (D) The privacy interests affected

The Union contends that the majority of the covered employees here do not have reduced privacy expectations. By the Union's estimate, at most only 33,052 of the approximately 85,000 covered employees, hold "safety-sensitive positions." [8] D.E. 34

---

8. Neither of the parties has advised the Court

of the number of "safety-sensitive positions"

¶ 19. The Union reasons, in short, that holding a "safety-sensitive position" is a necessary condition for a covered employee to have a diminished privacy interest. D.E. 33 at 11.

The Governor, in response, asserts that all of the covered employees—regardless of position—have reduced privacy expectations as a result of three factors: (1) the widespread use of drug testing among private employers; (2) the fact that the tests can be administered only with the employee's consent; and (3) Florida's tradition of transparency in state government. D.E. 35. The Court considers, in turn, the Governor's claims as to the significance of each factor on the privacy interests of the individuals covered by the EO.

### (1) Use of drug testing by private employers

In support of the first argument, the Governor asserts that the prevalence of testing programs at private companies should be indicative of the "reasonableness" of the Governor's drug testing program because the Supreme Court has maintained that "customary social usage [has] a substantial bearing on Fourth Amendment reasonableness in specific circumstances." *Georgia v. Randolph*, 547 U.S. 103, 121, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006). *see also, Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan J., concurring); *United States v. Jones*, —— U.S. ——, 132 S.Ct. 945, 953, 181 L.Ed.2d 911 (2012) (Alito, J., concurring).

But the case law provides little or no support for the Governor's conclusion. He cites only a single case, *Willner*, in which the D.C. Circuit relied upon data demonstrating the use of drug-testing programs by private employers to assess the "reasonableness" of a drug testing program. 928 F.2d at 1191–92. However, in *Willner*,

the D.C. Circuit cautioned against overemphasizing data showing the prevalence of testing programs among private employers nationwide, calling such statistics "quite general," and noted that they said "nothing" about the practice that was used by private firms in the specific field of the plaintiff. *Id.* at 1192. Thus, while the Willner Court recognized that drug testing in the private sector was "a measure of the degree of privacy that [government] job applicants can reasonably expect," 928 F.2d at 1191, the D.C. Circuit placed greater weight on other factors in determining the "reasonableness" of the challenged drug test, including the "extraordinarily intrusive" background investigation that was required of those applying to be assistant U.S. attorneys, the position that the plaintiff sought. *Id.* Additionally, in Skinner and Nat'l Treasury, both of which dealt with employee testing, the Court never indicated that the use of drug testing by private employers is relevant to the "reasonableness" determination.

Putting aside the fact that the Governor has not cited a controlling legal authority that requires this Court to assign any weight to the use of drug testing by private employers, the pertinent exhibits that the Governor submits simply are not persuasive. Nearly all of the surveys concerning the prevalence of testing nationwide date back several years, *see, e.g.,* D.E. 38–8, D.E. 38–12, D.E. 38–13, and report the percentages of firms that test their employees, and not the overall percentages of employees tested either nationally or broken down by employment sector or firm, *see, e.g.,* D.E. 38–14, D.E. 38–17, D.E. 38–18, D.E. 38–19. And with respect to private sector drug testing in Florida, the Governor merely submits a list, taken from the Internet site of an organization opposing drug testing, of

held by the approximately 50,000 Union members covered by the EO.

some of Florida's largest employers who test, and a sampling of Web-based job applications from many of the state's largest employers, requiring applicants to consent to drug testing. D.E. 38–20; D.E. ¶ 12(*l*)-(k); D.E. 39.

None of the exhibits explains the nature of the drug-testing programs adopted by these employers, and the exhibits, in the aggregate, fail to demonstrate the extent to which random drug testing of all employees has become a common practice. In other words, what the list and applications mean for the reasonable expectation of privacy of any of the individuals covered by EO is left unstated. The evidence that the Governor presents on drug-testing programs at private firms, in sum, does not convince the Court that the individuals covered here have diminished privacy interests simply because many private-sector employers have adopted drug-testing programs.

### (2) Consent to drug testing

Additionally, the Governor argues that because no one is compelled to take a drug test—covered individuals can refuse and find other employment without legal consequence—the employees' submission to testing, albeit as a condition of continued employment, vitiates entirely their reasonable expectation of privacy. D.E. 35 at 5–8. Even assuming that submission could somehow be equated with consent, the dispositive question in the cases decided by the Supreme Court is not whether an individual has consented to a drug test, but rather whether he or she has chosen an occupation that entails a standard or diminished expectation of privacy. Thus, when the Court considered the privacy interest that applied to the railroad personnel *Skinner,* it explained that these employees' had diminished privacy expectations, not because they were free to avoid taking the test without legal consequence, but "by reason of their participation in an industry that is regulated pervasively to ensure safety." 489 U.S. at 627, 109 S.Ct. 1402. Similarly, in *Nat'l Treasury,* the Court held that the privacy interests of the covered border patrol agents were overcome not because they consented to the test, but because by "seek[ing] to be promoted" to high-risk, safety-sensitive positions, they incurred a diminished privacy interest. 489 U.S. at 677, 109 S.Ct. 1384. And likewise in *Vernonia,* what mattered to the Court's assessment of the privacy interest was not that the drug test was a condition for participation in student athletics—the school district required the student and his or her parents to sign a General Authorization Form-but that "[b]y choosing to 'go out for the team,' [the student athletes] voluntarily subject themselves to a degree of regulation even higher than that imposed on students regularly." 515 U.S. at 657, 115 S.Ct. 2386.

The Governor contends that in *Skinner* and *Nat'l Treasury,* the government never argued to the Court that the consent of the covered employees overcame their privacy interest, and therefore the question remains unsettled. But this interpretation ignores the fact that in these cases and in *Vernonia,* the Court considered the question of consent, and determined that it was relevant only to the assessment of whether the affected individuals' privacy interests were diminished in light of their chosen professions (*Skinner*) and *Nat'l Treasury* or chosen activities (*Vernonia*). See *Skinner,* 489 U.S. at 627, 109 S.Ct. 1402; *Nat'l Treasury,* 489 U.S. at 677, 109 S.Ct. 1384; *Vernonia,* 515 U.S. at 657, 115 S.Ct. 2386. The Governor's claim that consent makes a search reasonable may indeed describe the role of consent in criminal cases in which Fourth Amendment claims are routinely made to seek the suppression of physical evidence, but it does not conform at all with the approach taken by the U.S. Supreme Court in regulatory drug testing cases. Thus, the fact that the covered

employees have the option to submit to the drug tests or seek other employment does not make the search reasonable under the Fourth Amendment.

### (3) Florida's transparency in state government

Finally, the Governor cites state laws requiring some state employees under certain circumstances to make financial disclosures, Fla. Stat. §§ 112.3145 and 112.3148, and providing open access to public records, Fla. Stat. §§ 119.01, 119.011(2), (12) and § 119.07(1)(a), as establishing a tradition of transparent government sufficient to show that all state employees under his purview have diminished privacy interests with respect to random and pre-employment urinalyses. But the Governor's reasoning is hardly transparent and frankly obscure. He offers no plausible rationale explaining why the fact that a state employee's work product and financial status are publically accessible leads to the conclusion that the employee's expectation of privacy in his or her bodily functions and fluids is then diminished. And in any event, no court has relied upon a policy of transparent government, embodied in laws such as those cited by the Governor, as sufficient to overcome a public employee's reasonable expectation of privacy in the contents of his or her urine.[9] This Court sees no reason to be the first.

### (E) Balancing the public and private interests

"To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing." *Chandler*, 520 U.S. at 313, 117 S.Ct. 1295. But as the Supreme Court explained in *Skinner*: "In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." 489 U.S. at 624, 109 S.Ct. 1402. Although the Supreme Court has not precisely articulated an analytical framework for determining what constitutes an "important governmental interest," it can be readily gleaned from *Skinner, Nat'l Treasury, Vernonia,* and *Chandler* that an interest sufficient to justify a drug testing regime in the context of public employment must be more narrowly defined than the public concern behind the EO. In *Skinner,* the Court upheld a testing program in light of its "surpassing safety interests." *Id.* at 634, 109 S.Ct. 1402. In *Nat'l Treasury,* the Court was swayed by "the extraordinary safety and national security hazards" at issue there. 489 U.S. at 646, 109 S.Ct. 1402. *See also Vernonia,* 515 U.S. at 662, 115 S.Ct. 2386 (indicating that the testing program was "directed more narrowly to drug use by school athletes," leaving the non-athletes free from the privacy intrusion).

■ In the present case, the Court searches in vain for any similarly compelling need for testing. The EO does not identify a concrete danger that must be addressed by suspicionless drug-testing of state employees, and the Governor shows no evidence of a drug use problem at the covered agencies. Like the Georgia statute overturned in *Chandler,* the EO is designed to improve governmental operations and public confidence in government

9. The types of employment conditions that courts have recognized as reducing an individual's privacy include, as stated *supra,* extensive government regulation of an individual's profession, *Skinner,* 489 U.S. at 627, 109 S.Ct. 1402, direct involvement in drug interdiction or the carrying of a firearm in the line of duty, *Nat'l Treasury,* 489 U.S. at 672, 109 S.Ct. 1384, invasive background checks, *Willner,* 928 F.2d at 1190, and medical examinations, *Nat'l Treasury,* 489 U.S. at 677, 109 S.Ct. 1384.

employees generally by testing for illegal drug use. In *Chandler*, the policy's proponents also insisted that unimpaired state officials would exercise better judgment, discharge public functions more fruitfully, and demand greater trust and confidence from the electorate. 520 U.S. at 318, 117 S.Ct. 1295. Yet the Supreme Court found the program constitutionally deficient.

The fundamental flaw of the EO is that it infringes privacy interests in pursuit of a public interest which, in contrast to the concrete and carefully defined concerns in *Skinner*, *Nat'l Treasury*, and *Vernonia*, is insubstantial and largely speculative. *Compare Chandler*, 520 U.S. at 318, 117 S.Ct. 1295 (rejecting unsubstantiated claim that illegal drug use impairs the discharge of public functions). The privacy interests infringed upon here outweigh the public interest sought. That is a fatal mix under the prevailing precedents.

### Question (3)—Facial v. As Applied Challenge

■■■ The Governor's final argument is that the Union has brought an unsuccess-

ful facial challenge to the EO because the Union cannot show that "no set of circumstances exist" under which the EO is valid. The U.S. Supreme Court has held that "[t]o succeed in a typical facial attack, [a plaintiff] would have to establish that no set of circumstances exists under which [the challenged law] would be valid, or that the statute lacks any plainly legitimate sweep." *United States v. Stevens*, —— U.S. ——, 130 S.Ct. 1577, 1587, 176 L.Ed.2d 435 (2010).[10] As the Governor correctly points out, the Union concedes that testing some of the employees covered by the EO is constitutionally permissible. "The Fourth Amendment," it writes, "permits a state to drug-test state workers holding safety-sensitive or special risks jobs. The Union has no quarrel with that." D.E. 35 at 3–4; D.E. 19 at 7–8.

■■■ However, the Court construes the Union's concession as consistent with an "as-applied" challenge. In its filings, the Union asserts at most that the EO cannot be constitutionally applied to any current employee at a covered agency.[11] *See Citi-*

**10.** The Supreme Court has explained that facial challenges, which are frequently speculative and rely upon underdeveloped factual records, "also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than the is required by the precise facts to which it is applied. Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450–51, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008).

**11.** In its Complaint, the Union alleged that "[t]he drug-testing regime mandated by the order inflicts real harm upon state employees represented by AFSCME because it violates their constitutional right to be free from un-

reasonable governmental searches." D.E. 1 ¶ 19. The Union's discovery disclosures, cited by the Governor as evidence that the Union was bringing only a facial challenge. D.E. 35 at 4, display the Union's belief that the EO is unconstitutional as applied to current employees at the covered agencies. For example, the Governor quotes Union as stating the following in response to an interrogatory: "we deny that [the EO] can ever be constitutionally applied to anyone." D.E. 36–3 ¶ 6. Yet the question to which this statement responded asked the Union to identify any "person or position" at a covered agency to which the EO could not be constitutionally applied. The Union responded that "[b]ecause the drug-testing regime mandated by EO 11–58 unlawfully fails to limit random drug-testing to employees in safety-sensitive jobs, or to employees reasonably suspected of drug abuse, we deny that it can ever be constitutionally applied to anyone." *Id.* The context of the response makes it apparent that the Union was stating that the EO could not be constitutionally applied to "anyone" currently

*zens United v. FEC*, 558 U.S. 310, 130 S.Ct. 876, 893, 175 L.Ed.2d 753 (2010) (holding that "[t]he distinction between facial and as-applied challenges ... goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint;") *see also Doe v. Prosecutor*, 566 F.Supp.2d 862, 877 (S.D.Ind.2008) (interpreting plaintiffs' challenge to sex-offender registration law as an as-applied challenge where plaintiffs' theory did not challenge application of the law to persons on parole or probation but only as-applied to convicted sex offenders who had completed their criminal sentences). The Union makes no claims as to the constitutionality of the EO as it relates to preemployment testing of non-current employees, or the random testing of those hired after the issuance of the EO. The Court, moreover, leaves these questions unresolved in this order. Accordingly, this Order disposes only of the Union's contention that the EO violates the Fourth Amendment "as applied" to current employees in the covered agencies.

## V. JUDGMENT

▆ The Union here asks for a permanent injunction, which requires three elements: (1) there was a legal violation; (2) there is a serious risk of continuing irreparable injury if an injunction is not granted; and (3) there are no adequate remedies at law. *Bolin v. Story*, 225 F.3d 1234, 1242 (11th Cir.2000). Here, the Court finds

that the EO, as applied to current employees at the covered agencies, is violative of the Fourth Amendment, and that these employees will suffer irreparable harm if subjected to it. *See Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir.1992) (holding that Fourth Amendment violation is enough to show irreparable harm); *see also Am. Fed'n of Teachers–West Va., AFL–CIO v. Kanawha Cnty. Bd. of Educ.*, 592 F.Supp.2d 883 (S.D.W.Va.2009); *Bannister v. Bd. of Cnty. Commis. of Leavenworth Cnty., Kan.*, 829 F.Supp. 1249 (D.Kan. 1993); *Marchwinski v. Howard*, 113 F.Supp.2d 1134 (E.D.Mich.2000), *but see* 309 F.3d 330 (6th Cir.2002) (holding that district court erred in granting preliminary injunction) vacated by 319 F.3d 258 (6th Cir.2003). The Court also concludes that there is no adequate remedy at law in light of the immeasurable nature of the harm that will flow from the EO's implementation; were the EO to be implemented, the current employees at the covered agencies would suffer a Fourth Amendment violation that cannot be remedied in monetary terms. "Indeed, one reason for issuing an injunction may be that damages, being immeasurable, will not provide a remedy at law." *Treasure Valley Potato Bargaining Asso. v. Ore–Ida Foods, Inc.*, 497 F.2d 203, 218 (9th Cir.1974); cert. denied 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974).

▆ The Court is mindful, however, that injunctive relief should be limited in

employed at a covered agency. In other early filings, the Union reiterated this theory that EO could not be applied to any covered employee, regardless of whether he or she was a member of the Union. *See, e.g.,* D.E. 12 ¶ 3 (claiming that the central issue presented in the case was whether the Fourth Amendment permits "the state to drugtest *all executive branch workers,* regardless of whether the worker holds a safety-sensitive job, and regardless of whether there is a reasonable suspicion that the worker is using drugs") (emphasis added); *see also* D.E. 19 at 8 (asserting

that the Union was challenging the EO because "it indiscriminately commands the drug-testing of *all* employees, without regard for whether they hold safety-sensitive jobs and without regard for whether reasonable suspicion of drug abuse exists.") (emphasis in original). The Court considers the statement, made via e-mail by Union's counsel and cited here by the Governor, that the Union was "alleging that [the EO] was facially unconstitutional," D.E. 46–1, not to foreclose the as-applied challenge that the Union had articulated in the pleadings and other filings.

scope to the extent necessary to protect the interests of the parties. *See Gibson v. Firestone*, 741 F.2d 1268, 1273 (11th Cir. 1984). Because the Union did not contend that the EO is unconstitutional as applied to "prospective new hires," meaning individuals who are not currently employed at covered agencies, the Court does not reach the issues of whether such prospective employees can be subjected to preemployment testing and subsequent random drug testing pursuant to the EO. However, the relief encompasses both Union and non-Union employees because the EO is unconstitutional as applied to them for precisely the same reasons. Accordingly, the Court grants permanent injunctive relief to all individuals currently employed at covered agencies.

For the reasons herein stated, it is ORDERED AND ADJUDGED that Plaintiff's Motion for Summary Judgment is GRANTED and Defendant's Motion for Summary Judgment is DENIED.